**TIFD III–E INC., The Tax Matters Partner of Castle Harbour–I Limited–Liability Company, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. 01cv1839 (SRU) (lead), 01cv1840 (SRU).**

United States District Court, D. Connecticut.

Signed March 28, 2014.

Ann H. Rubin, Carmody & Torrance, Waterbury, CT, Anthony M. Fitzgerald, David S. Hardy, Carmody & Torrance, New Haven, CT, David J. Curtin, Michael

J. Desmond, William S. McKee, William F. Nelson, Bingham McCutchen, John A. Galotto, McKee & Nelson, Washington, DC, Suzanne C. Feese, King & Spalding, Atlanta, GA, for Plaintiff.

Christine Grant Michaelis, Lara E. Ewens, Robert J. Higgins, Barry E. Reiferson, U.S. Department of Justice, Washington, DC, John B. Hughes, U.S. Attorney's Office, New Haven, CT, for Defendant.

## RULING ON MOTION FOR IMPOSITION OF THE NEGLIGENCE PENALTY

STEFAN R. UNDERHILL, District Judge.

Defendant, the United States, moves for an order imposing a negligence penalty on plaintiff TIFD III–E Inc. ("TIFD") for tax years 1997 and 1998. During the 1990s, TIFD's parent company, General Electric Capital Corporation ("GECC"), joined with a pair of Dutch banks ("the Dutch Banks" or "the Banks") to form an aircraft leasing company. TIFD considered the Dutch Banks to be its partners in the venture, and did not report any income allocated to the Banks on its own tax returns. During the course of this litigation, I twice found that decision to be more than reasonable; indeed, I found that the company correctly deemed the Banks to be equity stakeholders rather than lenders. *TIFD III–E v. United States*, 342 F.Supp.2d 94 (D.Conn. 2004) ("*Castle Harbour I*"); *TIFD III–E v. United States*, 660 F.Supp.2d 367 (D.Conn.2009) ("*Castle Harbour III*"). The Second Circuit twice disagreed. *TIFD III–E v. United States*, 459 F.3d 220 (2d Cir.2006) ("*Castle Harbour II*"); *TIFD III–E v. United States*, 666 F.3d 836 (2d Cir.2012) ("*Castle Harbour IV*"). So, after more than a decade of litigation, TIFD ultimately lost this case. In addition, the Second Circuit held that the IRS could impose a 20% accuracy penalty against TIFD for substantial understatement of its income taxes in 1997 and 1998.

Ordinarily, that would have ended the matter. The government, however, later realized that the substantial understatement penalty could not be assessed because the 10% substantial understatement threshold had not been satisfied (presumably because the payments to the Dutch Banks that the Second Circuit held were interest payments thereby became deductible to the taxpayer, thus reducing its tax liability). *See* I.R.C. § 6662(d). As a result, the government now seeks to impose the 20% accuracy penalty for different reasons, arguing that TIFD's underpayment was attributable to negligence. For the reasons set forth below, I find that TIFD's tax position had a reasonable basis and therefore conclude that the negligence penalty is not applicable.

## I. Background

I assume the parties' familiarity with the facts underlying this case. *See Castle Harbour I*, 342 F.Supp.2d at 95–108. For the purposes of this opinion, however, it is useful to recall GECC's intent when it went into business with the Dutch Banks, and the basic structure of Castle Harbour's financing. All facts are taken from my previous decisions.

GECC entered the aircraft leasing business to reap tax benefits, but it later sold a stake in its airplanes for a different reason entirely—to mitigate risk in a shaky aircraft-leasing market. Commercial aircraft lose substantial value over time. Companies with sizable income like GECC purchase airplanes and then lease them so that they can take advantage of large, predictable depreciation deductions. But in the early 1990s, GECC started to question the wisdom of its investment; several airlines had fallen into bankruptcy, and

GECC worried about the risk of owning airplanes that it did not use and could not rent to others.

To reduce its exposure, it initiated what it called a "sell-down" effort—it sought a partner that would buy a stake in the airplanes, leaving GECC with cash up front and less risk down the line. In other words, as I explained in my previous opinion, "rather than simply awaiting return in the form of the now-less-certain-rental income, GECC wanted to lower its risk by raising immediate cash against the future stream of income." *Castle Harbour–I*, 342 F.Supp.2d at 96. But GECC could not pursue traditional strategies for raising cash. The market for aging commercial aircraft was weak, so it could not sell off the planes. Nor could it use them as collateral for a secured loan. In order to maintain its AAA credit rating, GECC had agreed to limit its leverage, and in 1993 GECC's debt-to-common-equity ratio hovered just below that threshold. In addition, a number of GECC's medium-term and long-term debt instruments contained a "negative pledge"—a covenant prohibiting GECC from using its assets to secure debt other than purchase money debt.

With those circumstances in mind, GECC solicited proposals that would allow it to raise cash without incurring any debt. Seven major investment banks responded, but after careful review, GECC rejected each of those bids as inadequate to achieve its purpose. After some back and forth, the investment bank Babcock & Brown submitted a plan acceptable to GECC. Pursuant to the plan, GECC would create a separate entity to which it would contribute aircraft and would then solicit investors to purchase ownership shares in the new entity. The proposal had an addition-al lucrative upside—the investors would be foreign tax-neutral entities, and any income allocated to those partners would not be subject to U.S. income tax.

Had the Dutch Banks simply bought a stake in the business, the parties would have been spared more than ten years of litigation. But the deal was more complex; as the Second Circuit described it, "[a]n extraordinarily complex maze of partnership provisions dictate[d] how the revenues, losses, and assets of the partnership would be allocated over the eight-year duration of the partnership." *Castle Harbour II*, 459 F.3d at 226. The details of that labyrinth can be found in my previous decisions, but they resulted in a partnership arrangement that in some ways resembled preferred stock, but in other ways resembled the relationship between a debtor and a creditor: GECC retained the ability to buy the Dutch Banks out of their stake at any time. If GECC did not exercise that option, the entity would slowly buy the Dutch Banks' stake over the course of eight years, and the Banks would reap a guaranteed return of at least 8.5 % on their initial investment. But even though the Dutch Banks were insulated from any loss, they could still benefit from what I called the "upside potential"—the chance that the business would perform well and they would earn more than the guaranteed return (indeed, the Banks actually realized an approximately 9.1 % gain). *Castle Harbour–I*, 342 F.Supp.2d at 110. I have always seen this possibility as a meaningful opportunity, whereas the Second Circuit viewed it as "narrowly circumscribed." *Castle Harbour II*, 459 F.3d at 234. My finding that the transaction had economic substance and a valid business purpose, however, was not overturned on appeal. *See id.* at 231–32.[1]

---

**1.** In fact, the government did not even appeal that finding. Br. for Appellant at 35 (May 6, 2005), 2005 WL 6517266 ("Although we continue to believe that the transactions as a

Despite the extensive litigation, no court has had occasion to squarely address the question whether TIFD acted negligently when it treated the Dutch Banks as equity partners for tax purposes. The government sought two alternative accuracy-related penalties in this case: one for substantial understatement of income tax and one for negligence.[2] After remand in *Castle Harbour II*, I held that the government could not collect a substantial understatement penalty, because TIFD had a sound basis for believing it had given its partners an equity stake in the Castle Harbour venture. *Castle Harbour III*, 660 F.Supp.2d at 399 (reviewing *Jewel Tea Co. v. United States*, 90 F.2d 451 (2d Cir.1937), and *Comm'r of Internal Revenue v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir.1935)). Because I held that TIFD had cleared the higher standard of substantial authority, I necessarily concluded that TIFD had a reasonable basis to treat the Banks as equity partners. *Id.* The Second Circuit reversed the first holding; therefore, it was unnecessary for it to decide whether the negligence penalty applied. After realizing that the substantial understatement penalty would not yield a penalty payment, however, the government revived its fallback theory. It now argues that TIFD had no reasonable basis for believing that the Banks were anything but lenders, and that it should be penalized for its negligence.

## II. Discussion

### A. *Authority to Consider the Application of the Negligence Penalty*

■ As a threshold matter, the government asserts that I lack the authority to decide whether the negligence penalty applies, because the Second Circuit's decision in *Castle Harbour IV* automatically became an order of this court, pursuant to Local Rule 77.1(e). That argument is flawed, because the parties jointly moved to alter the judgment (doc. # 145), and I granted that motion (doc. # 146). It was not until a dispute over the substance of the proposed alterations arose that the government opposed modification of the judgment on the grounds that the Second Circuit reversed without remand. Def.'s Proposal Re Entry of Judgment (doc. # 155).[3] Yet, it is the government, not TIFD, which seeks to amend the judgment to include a negligence penalty. *See* Mot. Hr'g Tr. 2:18–25, Apr. 25, 2013 (doc. # 183); Proposed Judgment (doc. # 160). Because the parties properly moved to alter the judgment, I have the authority to decide whether to impose the negligence penalty despite the Second Circuit's reversal without remand.

Substantively, the government's position is that *Castle Harbour IV* vacated my decision in *Castle Harbour III* in its entirety and left intact the FPAA determination made by the IRS before this suit began. Def.'s Mem. Supp. N. Penalty 5 (doc. # 162). That view, however, is not

---

whole lacked economic substance, and that the District Court erred in holding otherwise, we do not renew that argument on appeal.").

**2.** Pursuant to Treas. Reg. § 1.6662–2(c), accuracy-related penalties may not be stacked.

**3.** Its objections notwithstanding, the government fully briefed its position with respect to the substance of the judgment. Initially, the parties' dispute centered on the applicable deductions for interest paid and whether the

substantial understatement penalty was subject to partner-level defenses in partnership-level proceedings. Then, the government realized that the substantial understatement penalty would yield no monetary consequence. Consequently, it moved for an order for imposition of the negligence penalty. The parties subsequently settled the interest-rate issue, which means that the applicability of the negligence penalty is the only issue left to be decided.

supported by the applicable statutory framework, which provides: "Any determination by a court under this section shall have the force and effect of a decision of ... the district court ... and shall be reviewable as such." I.R.C. § 6226. I previously ruled that the negligence penalty was not applicable, and the Second Circuit did not overturn that determination. Although the Second Circuit's holding in *Castle Harbour IV* negates my reasoning for previously holding that the negligence penalty does not apply, *nothing in the Court's decision indicates that I am prohibited from considering afresh the arguments in favor of and against the application of the negligence penalty.*

B. *Statutory and Regulatory Framework*

Taxpayers who submit inaccurate returns must pay a 20% penalty for "any underpayment which is attributable to ... [n]egligence or disregard of rules or regulations." I.R.C. § 6662(a) & (b)(1). The statute defines "negligence" as "any failure to make a reasonable attempt to comply with the provisions of this title." I.R.C. § 6662(c).

The IRS has enacted a regulation that describes when a taxpayer fairly can be said to have been negligent. Treas. Reg. § 1.6662–3. "Negligence" is defined by example, and is "strongly indicated" when the taxpayer "fails to include on an income tax return an amount shown on an information return" or "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." *Id.* § 1.6662–3(b)(1)(i) & (ii). A return position that has a "reasonable basis," however, "is not attributable to negligence." *Id.* § 1.6662–3(b)(1). The "reasonable basis" standard creates a broad limit to negligence penalty liability; a tax position that

otherwise might seem "too good to be true" to a reasonable taxpayer, for example, will not be found negligent if the position has a "reasonable basis." *See id.*

"Reasonable basis" is a "relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper." *Id.* § 1.6662–3(b)(3). "The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." *Id.* A "reasonable basis" may be found where a return position "is reasonably based" on one or more of the authorities used to determine whether "substantial authority" exists for a tax position. *Id.* § 1.6662–3(b)(3). Those authorities include regulations, court cases, legislative history, private ruling letters, and technical advice memoranda. *Id.* § 1.6662–4(d)(3)(iii).

In *Castle Harbour IV*, the Second Circuit examined the authorities proffered in support of TIFD's tax position and held that those authorities did not shield TIFD from the substantial understatement penalty. That decision, however, has little impact on the question of TIFD's negligence. Although both the negligence penalty and the substantial understatement penalty involve an objective analysis of relevant authorities, *see, e.g., Neonatology Associates, P.A. v. C.I.R.*, 299 F.3d 221, 233 (3d Cir.2002) ("Generally speaking, the negligence standard as in the tort context is objective...."); *Smoker v. C.I.R.*, 105 T.C.M. (CCH) 1389 (T.C.2013) ("The substantial authority standard is an objective test ...."); "reasonable basis" is a less stringent standard than "substantial authority." *See id.* A return position may "satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard." Treas. Reg. § 1.6662–3(b)(3). By way of illustration, the Joint Committee on Taxation has lik-

ened the "substantial authority" standard to a 40% chance of success on the merits, while the "reasonable basis" standard will be satisfied, and a taxpayer cannot be found negligent, if its tax position has a 20% chance of success on the merits. Jt. Comm. on Taxation, *Study of Present–Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters)*, 106th Cong. 163 (1999).

A taxpayer can misinterpret an authority, reach the wrong conclusion, and still behave reasonably. This must be so for the "reasonable basis" standard to have meaning; otherwise there would be no such thing as a "reasonable but mistaken" position, and every situation in which litigation leads to tax liability would support imposition of a tax penalty. As the Sixth Circuit has counseled, "[a] taxpayer is not required to be perfect [for] [e]ven tax specialists cannot be perfect.... Reasonable minds can differ over tax reporting [even when] the IRS disallows certain transactions." *Mortensen v. C.I.R.*, 440 F.3d 375, 385 (6th Cir.2006). The negligence penalty "will not be applied where the deficiency is due to a mistaken interpretation of the law on which there can be an honest difference of opinion." *Bergersen v. C.I.R.*, 70 T.C.M. (CCH) 568 (T.C.1995), *aff'd*, 109 F.3d 56 (1st Cir.1997) (citing *Foster v. Comm'r*, 756 F.2d 1430, 1439 (9th Cir. 1985); *Wiggins v. Comm'r*, 92 T.C. 869, 873–74 (1989), *aff'd*, 904 F.2d 311 (5th Cir. 1990)); *see also Everson v. United States*, 108 F.3d 234, 237–38 (9th Cir.1997) ("When a legal issue is unsettled, or is reasonably debatable, an underpayment generally will not [be found negligent].").

### C. TIFD's "Reasonable Basis"

I have little trouble finding that TIFD had a "reasonable basis" for treating the Dutch Banks' stake in Castle Harbor as an equity interest rather than debt. GECC never intended to indebt itself to the Dutch Banks. The evidence at trial demonstrated just the opposite: in 1993, it was contractually barred from leveraging its assets to borrow money, and it solicited proposals from financial professionals with the explicit instruction that the plans raise capital, not incur debt. As TIFD has always maintained, GECC believed that it was offering the Banks a partnership stake akin to "non-participating preferred equity," a class of financial interest that pays holders dividends at a fixed rate following a pre-determined formula. Pl.'s Mem. Opp. N. Penalty 5 (doc. # 167); Pl.'s Post Hr'g Mem. 4 (doc. # 176).

In *Castle Harbour III*, I accepted this analogy, and cited *Jewel Tea* as providing substantial authority for TIFD's position. 660 F.Supp.2d at 399. The Second Circuit disagreed:

In *Jewel Tea*, we ruled that purported preferred shares, unlike the debentures in *O.P.P.*, were properly treated as equity for tax purposes because at no time could the holders demand their money; "they were at the mercy of the company's fortunes and payment was merely a way of distributing profits." In contrast to the holders of the preferred shares in *Jewel Tea*, the banks in the instant case were effectively promised recovery of their principal investment at a set rate of return, payable on a set schedule. Of course, the banks' return was not completely divorced from Castle Harbour's performance. But, as we have explained, because those aspects of the banks' promised return that depended on Castle Harbour's performance were so unlikely to result in the banks' receipt of a return that meaningfully deviated from the Applicable Rate, the banks

were in no real sense co-venturers in the partnership's fortunes. *Castle Harbour IV*, 666 F.3d at 849. In other words, because the Dutch Banks likely would receive a sum certain within a fixed time period, they were effectively creditors. In the Second Circuit's estimation, the Dutch Banks simply accepted too little risk in the venture to be treated as equity holders.

But GECC reasonably could have believed that, to borrow the Second Circuit's term, the Dutch Bank's "narrowly circumscribed risk" would not transform equity into debt. TIFD points to a mountain of authority—all decided or promulgated before TIFD filed its returns—that classified preferred stock as equity even though holders were guaranteed a result and their profits did not depend on corporate growth. Indeed, courts have long treated preferred stock as equity. *See, e.g., Staked Plains Trust v. Comm'r*, 143 F.2d 421 (5th Cir.1944) (holding that certificates were equity not debt even though holders were entitled to a sum certain plus fixed interest); *Dorsey v. United States*, 311 F.Supp. 625, 628 (S.D.Fla.1969). In *Dorsey*, for example, a mortgage company's principal contributed $100,000 to the company, because it needed capital to meet federal capitalization requirements. In exchange, the company created a class of stock that paid the investor a fixed 4% return, but the company retained the power to call the stock as soon as it had enough money to meet the capitalization requirement on its own. When the company tried to deduct the 4% payment as loan interest, the government objected and the district court agreed. *Id.* at 629.

Provisions of the Internal Revenue Code also classify preferred stock as equity for tax purposes, even when the stock's value does not depend on corporate growth, is redeemable at the holder's discretion, and is callable by a corporation at a fixed price. For example, under I.R.C. § 351, a party who controls a company may exchange property for stock in the entity without reporting a gain on his tax return. But the stock cannot be a scrim for a loan; subsection (d) excludes unsecured "indebtedness" from the exemption. The provision then clarifies that preferred stock should not be considered debt, even though it "is limited and preferred as to dividends and does not participate in corporate growth to any significant extent." I.R.C. § 351(g); *see also* I.R.C. § 1504(a)(4) (respecting as equity nonvoting stock that "does not participate in corporate growth to any significant extent"). The IRS has echoed this principle in rulings that distinguish preferred stock from bonds. In 1994, just after GECC and the Dutch Banks struck the Castle Harbour deal, the agency ruled that preferred stock was equity for tax purposes even though it resembled debt in almost every respect: the interest was debt for corporate law purposes, the stock matured and paid-out a fixed amount on a specific date, and its holders retained the rights of creditors. Rev. Rul. 94–28, 1994–1 C.B. 86.

Preferred stock differs from the Castle Harbour deal in some respects, and the Second Circuit discarded the comparison in favor of an analogy to a "secured lender." But a reasonable person might not have known that it had chosen the wrong comparator—indeed as a government expert testified at trial:

> [T]he accounting standards in debt versus equity are complicated. There is no standard that relates to any instrument exactly like this. One has to draw [analogies] to other instruments and as we've seen there are many analogies that can be drawn.

Pl.'s Mem. Opp. N. Penalty 9. Given this murkiness, it was entirely reasonable for

TIFD to rely upon decisions in which an investor made a capital contribution and was compensated with a low-risk payout over a fixed period of time. TIFD did so and reasonably concluded that the Dutch Banks' stake in Castle Harbour was the partnership equivalent of corporate preferred stock, an interest in a company that guarantees a return, limits the extent of profits, and allows a company to repurchase the stock at its own discretion.

TIFD's view looks especially reasonable in light of this litigation. If it had been clear that the Dutch Banks were lenders, there would have been no need for a two-week trial, two district court opinions, and two appeals. Having presided at the trial of this matter, I twice found not merely that TIFD was reasonable in its tax position, but that it was correct. Although the Second Circuit ultimately disagreed with my interpretation of the law, it did not indicate that my conclusions were "unreasonable." The Court openly acknowledged that the case was not a slamdunk for the government, because the relevant statute and regulations are ambiguous and "subject to multiple interpretations." *Castle Harbour IV*, 666 F.3d at 843. Moreover, academic experts have cited the split between the district court and the Second Circuit in this case as evidence that "corporate tax abuse is an uncertain area of the law." *E.g.*, Joshua Blank and Nancy Staudt, *Corporate Shams*, 87 N.Y.U. L.Rev. 1641, 1643 (2012).

■ Simply put, the objective reasonableness of a tax position becomes virtually unassailable when the taxpayer actually prevails at trial before a district judge who was not compromised by conflict, substance abuse, or senility. The reasonableness of the tax position on which TIFD

sustained its burden of proof of correctness after a lengthy bench trial—even if both taxpayer and judge ultimately were mistaken—scarcely can be questioned. Indeed, I am aware of no case in which a negligence penalty has been applied following reversal of a taxpayer's district court victory.[4] To the contrary, the Second Circuit has admonished the government for attempting to impose a negligence penalty in a case where it found that the district court had misinterpreted the law. *Holmes v. United States*, 85 F.3d 956, 963 n. 7 (2d Cir.1996) ("One may disagree, as we did, with the taxpayer [and the district court] on whether or not § 280A applies to cooperative stock, but the government's bald claim that the taxpayer did not exercise due care in making his argument is little short of reprehensible. And its persistence in asserting the negligence claim even after it lost below is mind boggling.... We therefore not only reject the claim of negligence in this case, but caution the government against making like claims in similar situations where the law is, at best, unclear.").

■ The government's position in this case can fairly be described as "mind boggling." *See Holmes*, 85 F.3d at 963 n. 7. It does not seriously argue that no authorities supported TIFD's tax position. At oral argument, the government declined to respond to TIFD's many proffered authorities because "it's too late, and it doesn't matter." Mot. Hr'g Tr. 32–33, Dec. 3, 2012 (doc. # 168). According to the government, TIFD must present evidence that it actually, subjectively relied on those precedents when it determined its tax liability. The government essentially asks me to draw an adverse inference from the fact

4. The government concedes that there is no case directly on point that supports its position.

that TIFD did not waive the attorney-client privilege with respect to the tax advice it received, but instead attempted to win based on the state of the law alone. But that interpretation defies both common sense and the larger structure of the regulations governing penalties. In general, a review for reasonableness is an objective assessment, one that does not consider an individual's actual state of mind. Section 1.6662–3 reflects this accepted standard, ascribing "reasonable basis" to the tax position, not the taxpayer. Treas. Reg. § 1.6662–3(b)(1) ("A return position that has a reasonable basis ... is not attributable to negligence."); *see also Didonato v. C.I.R.*, 105 T.C.M. (CCH) 1067 (T.C.2013) (noting that "petitioners could not avail themselves of the defense under section 6662(d)(2)(B)(ii) because they have failed to provide authority *that could provide a reasonable basis* for their return position" (emphasis added)); I.R.S. Chief Couns. Mem. at 3 (Feb. 26, 2010) (looking to the section 6662 accuracy-related penalty for guidance and finding that "[a] taxpayer's state of mind has no bearing on meeting the reasonable basis standard" contained in I.R.C. § 6676).

The IRS regulations do contain a safe harbor provision that examines a taxpayer's conduct and its subjective belief, allowing the taxpayer to avoid a penalty if it had "reasonable cause ... and acted in good faith." Treas Reg. § 1.6664–4. In determining whether the reasonable cause and good faith defense applies, the most important factor generally is "the extent of the taxpayer's effort to assess the taxpay-

er's proper tax liability." *Id.* Under section 1.6664–4, "[r]eliance on an information return, professional advice, or other facts ... constitutes reasonable cause and good faith if, under all the circumstances, *such reliance was reasonable and the taxpayer acted in goodfaith.*" *Id.* (emphasis added). But section 1.6664–4 is not the provision upon which TIFD relies.[5] The IRS included no such language in section 1.6662–3, and there is no reason to believe that it intended the "reasonable basis" standard to include a similar subjective component.

Of course, one way to bolster a case for a reasonable basis *could* be to show that a taxpayer relied on the independent advice of counsel. Such was the strategy in the case cited by the government, *Stobie Creek Investments, LLC v. United States,* 82 Fed.Cl. 636 (Fed.Cl.2008), *aff'd,* 608 F.3d 1366 (Fed.Cir.2010). Factual differences aside (*Stobie Creek* involved an opinion issued by a conflicted attorney and a transaction that lacked economic substance), that case does not support the proposition that there *must* be actual, subjective reliance by a taxpayer hoping to avoid a negligence penalty.[6] Whether a taxpayer's subjective reliance on certain authorities or on the advice of counsel was reasonable need not enter the equation until its position appears unreasonable to the objective observer. Here, the taxpayer's conduct appeared more than reasonable to me, it appeared correct. In such a case, the taxpayer's subjective belief simply is not relevant.

---

**5.** TIFD, correctly or incorrectly, asserts that the reasonable cause and good faith defense found in Treas. Reg. § 1.6664–4 does not apply at the partnership-level; therefore, it understandably has not briefed any issues related to reasonable cause and good faith (including reliance on advice of counsel) at this stage.

**6.** *Stobie Creek* focused on the potential for "significant overlap ... between the defense to the negligence penalty based on reasonable reliance on the advice of professionals and the reasonable cause and good faith exception to all accuracy-related penalties," and its discussion did not attempt to distinguish between those defenses. 82 Fed.Cl. at 708.

Finally, even if TIFD's conduct or state of mind were at issue here, the record reflects a cautious effort to create equity, not debt, and the company cannot be faulted for failing to correctly predict the ultimate outcome of this case. Corporate representatives reviewed proposals from seven respected investment firms before deciding on a plan. They evaluated those proposals based on one central criterion— that GECC amass no additional debt, for doing so would trigger a financial catastrophe for the company. After a series of revisions, vetted by Babcock & Brown and at the very least GECC's inside legal team, the company offered the Dutch Banks an ownership stake in the partnership. In short, there was nothing negligent or haphazard about the decision to enter into the Castle Harbour transaction or to treat the Banks' participation as a partnership interest rather than a loan. Accordingly, the negligence penalty is not applicable in this case.

### III. Conclusion

For the reasons stated above, the government's motion is DENIED.

It is so ordered.